234 N.J. Super. 471 (1988)
560 A.2d 1323
CHARLENE DEBOLT, GENERAL ADMINISTRATRIX AND ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF MARY ELLA CRAIN, DECEASED AND CHARLENE DEBOLT, INDIVIDUALLY, PLAINTIFFS,
v.
JUDSON S. PARKER AND L & L REDI MIX, INC., DEFENDANTS.
Superior Court of New Jersey, Law Division Burlington County.
Decided December 14, 1988.
*474 Francis J. Hartman for Robert I. Segal (Francis J. Hartman, Chartered, Attorney).
Howard N. Sobel for Ann Bernice Segal.
Robert Edwards, Guardian ad Litem for Ernest James Crain, Jr. and Larry Eugene Crain.
Mark S. Kancher for Charlene DeBolt, General Administratrix and Administratrix Ad Prosequendum of the Estate of Mary Ella Crain, deceased.
HAINES, A.J.S.C.
This opinion considers the propriety of counsel fee allowances in circumstances governed by our Rule of Professional Conduct ("RPC") 1.8(i). That rule permits spouses to represent "directly adverse" consenting interests after "consultation regarding the relationship." The opinion points to the risks involved in undertaking that representation, risks which may result in the disallowance of all fees. It suggests that threshold requirements of full disclosure and informed consent are not attainable. Nevertheless, despite somewhat less than adequate proofs, it concludes that counsel here are entitled to fees. That conclusion is reached because (1) no interpretation of RPC 1.8(i) has been provided in any published opinion in this state, and (2) because our cases thus far cling to the belief that full disclosure-informed consent requirements can be satisfied.
Ann Bernice Segal and Robert I. Segal are lawyers, practicing in different firms. They are married. Ernest Crain and his wife, Mary Ella Crain, a passenger in a car driven by him, were killed in an automobile accident. They left two minor children surviving. Their deaths occurred when their automobile, stopped and waiting to make a left turn, was struck in the rear by a cement mixer, the driver of which admitted that he had been adjusting his mirror at the time of the accident. He said that Ernest Crain had failed to signal his intention to turn. The *475 accident also involved a third vehicle, the occupants of which were injured.
Both Ann and Robert Segal had represented members of the Crain family in the past and were asked to represent them in connection with claims arising from the accident. In accordance with the family's wishes, Ann Segal represented the Mary Ella Crain estate and Robert Segal the Ernest Crain estate. By stipulation, the facts concerning the representation were submitted to the Court by way of affidavits.
Ann Segal believed, as a matter of strategy, that liability was so clear and insurance coverage on the cement mixer so high that the Ernest Crain estate should not be sued notwithstanding the decedent's claimed failure to signal. Ernest Crain had only $30,000 of insurance coverage on his car; if he were found to have been comparatively negligent, his estate would have been responsible for part of any verdict recovered, thereby adversely affecting the total recovery of the estates, the assets of which belonged entirely to the children of the Crains. Ann Segal states that, after a full discussion of the possibility of suing the Ernest Crain estate, she was requested by Charlene DeBolt not to sue. Consequently, she named only the owner of the cement mixer and its driver in her complaint. Robert Segal filed a separate action on behalf of the Ernest Crain estate, naming the same defendants.
Shortly after Ann Segal instituted her suit, she became involved in a dispute with Charlene DeBolt, the Administratrix ad prosequendum, concerning the disposition of personal injury protection monies collected as a result of the accident. Another attorney, Mark Kancher, was therefore retained by the Administratrix and substituted as counsel in the accident suit over Ann Segal's opposition. In the course of the substitution proceedings, claims were made that Ann Segal and Robert Segal had conflicts of interest in connection with their representation of the decedents' estates. The court therefore advised the Segals that their right to fees in connection with their *476 representations was in question, that the questions involved would be answered in such further proceedings as might be necessary. Independent counsel, Robert Edwards, was appointed to represent the interests of the minor Crain children as their guardian ad litem. He was requested to investigate all aspects of the controversy, to advise the court as to the claimed conflicts of interest and to act on behalf of the minors throughout the litigation.
Edwards advised the court that the Segals had no conflict of interest when they first undertook the representation of both estates so long as their marital relationship was revealed, as in fact, it was. He was also of the opinion that the strategic decision not to sue the Ernest Crain estate was acceptable at the time suit was commenced. He learned however, that four people occupying two other automobiles involved in the Crain accident had commenced two independent suits (later consolidated) naming, among others, the Ernest Crain estate as a defendant. One suit was filed 19 days after Ann Segal filed her suit, the other 5 months later. Edwards correctly anticipated the consolidation of all suits arising from the accident and recommended the immediate joinder of the Ernest Crain estate as a defendant in the suit brought by the Mary Ella Crain estate. Since Ann Segal was no longer involved in the litigation, he saw no reason for objecting to Robert Segal's continued representation of the proposed defendant. The court accepted Edwards's advice, directed joinder of the Ernest Crain estate as a defendant and authorized Robert Segal's continued representation, subject to the court's further ruling on fee questions.
The claims of both Crain estates were settled for substantial sums shortly after joinder of the Ernest Crain estate as a defendant. Both Segals have applied for the allowance of fees by the court. Those applications are addressed in this opinion.

A. The General Husband-Wife Rule For Attorneys.

Our Rules of Professional Conduct became effective September 10, 1984. Among them was RPC 1.8(i) which permits a *477 lawyer-wife to represent a person whose interests are adverse to those of another person represented by her lawyer-husband. The adoption of this rule of conduct reflects a substantial change in the law relating to husbands and wives. A milestone on the road to recognition of their independent rights was In re Gaulkin, 69 N.J. 185 (1976), in which the Supreme Court said:
We focus ... upon the trend of modern law which reflects society's realistic appreciation of the independence of both spouses in marriage and more specifically represents modern awareness and sensitivity to individual freedoms, rights, responsibilities and development. [at 193.]
The New Jersey Supreme Court Advisory Committee on Professional Ethics ("Committee") has given only modest consideration to questions involving conflicts between husband and wife attorneys. In Opinion No. 434, it addressed the propriety of an attorney's practice of criminal law when one of his associates was married to an assistant prosecutor in the same county. The Committee found no impropriety in his continued criminal practice. It said:
On one level, the public has come to recognize that married partners are independent individuals fully capable of pursuing separate professional careers. See In re Gaulkin, 69 N.J. 185 (1976). Hence it is unlikely that either spouse here would be regarded as the alter ego of the other for purposes of establishing an improper alliance between their respective offices.
See also the Committee's Opinion No. 508.
Our courts and the Advisory Committee have not addressed RPC 1.8(i). The courts of two foreign jurisdictions, however, have considered that rule. Blumenfeld v. Borenstein, 247 Ga. 406, 276 S.E.2d 607 (Sup.Ct. 1981), dealt with a trial in which an associate of the firm representing one party was married to a partner in the firm representing the other party. A challenge to the trial decision based upon the conflict allegedly caused by the relationship was unsuccessful. The Georgia court refused to reverse the decision. It said:
We find that the court disqualified the law firm solely on the basis of Mr. McClure's marital status. We further find that per se disqualification based on marital status is neither mandated nor justified by the Code of Professional Responsibility.

*478 ....
The mere fact that the public may perceive some conduct as improper is, without some actual impropriety, insufficient justification for interference with a client's right to counsel of choice. This becomes even more apparent when the perceived impropriety is not conduct at all but is, instead, status.
....
While we cannot disagree with the proposition that the marital relationship may be the most intimate relationship of a person's life, it does not follow that professional people allow this intimacy to interfere with professional obligations. If this court endorsed a rule imputing professional wrongdoing to an attorney on the basis of marital status alone, it would be difficult to avoid the extension of that rule to other relationships as well. [276 S.E.2d at 608-609]
The Georgia court noted: "According to the amicus curiae brief filed by the Atlanta Bar Association, Inc., at least 45 law firms and over 1000 attorneys in the Atlanta area would be affected by a per se disqualification rule based on marital status." 276 S.E.2d at 609, n. 4.
A thorough analysis of the husband-wife issue is found in Opinion No. 112 of the Ethics Committee of the Mississippi State Bar Association (1986). The opinion analyzed the opinions of courts and ethics committees in various states and cited Blumenfeld. It noted:
The Georgia Supreme Court stated that not a single case had been cited where a per se rule was applied to disqualify an attorney on the basis of an appearance of impropriety (such as marital status) alone. Rather, disqualification was ordered only when the appearance of impropriety was coupled with an actual conflict based on the conduct of the attorney.
The opinion, considering circumstances in which the husband and wife representing opposing parties actively work on the case, stated:
There is no per se disqualification of spouses representing opposing parties unless one spouse represents a public body or institution. Whether an attorney whose attorney-spouse represents an opposing party can ethically undertake or continue such representation depends on the facts of each particular case.
Despite the rejection of per se disqualification of spouses, even where both may actively work on the case, it must be pointed out that a personal conflict may arise because of the emotional bond between husband and wife. Also, a financial conflict may exist if the success of one party could result in an economic benefit to both spouses (for example, in a contingent fee case). Even if a potential conflict does exist, DR 1-010(A) permits an attorney to represent a *479 client only if the client consents after full disclosure of the potential conflict. The consent of both clients must be obtained whenever married attorneys seek to represent opposing parties. The nature of the conflict must be explained in such detail that the clients can understand why it may be desirable for each party to have independent counsel.
Finally, Opinion No. 86-5 of the Nebraska Ethics Committee found in the National Reporter on Legal Ethics n. 5/6 (1987), referring to the Blumenfeld decision and to Model Rule 1.8(i), held:
While some authorities have found that the representation of directly opposing parties by related attorneys is per se improper under the portions of the Code cited above, the Committee again rejects the concept of per se disqualification. The mere fact that the public may perceive some conduct as improper is, without some actual impropriety, insufficient justification for interference with a client's right to counsel of choice, particularly where the perceived impropriety is not conduct at all but is, instead, status. However, counsel should be required to advise the client of all circumstances that might impair the undivided loyalty of the attorney and to let the client make the decision as to employment.
The Georgia, Mississippi and Nebraska opinions are sensible and reliable. Their approach to the husband-wife question supports the interpretation of RPC 1.8(i) reached in the following analyses of that rule.

B. The Initial Representation  Adversity.

RPC 1.8(i) provides:
A lawyer related to another lawyer as parent, child, sibling or spouse shall not represent a client in a representation directly adverse to a person who the lawyer knows is represented by the other lawyer except upon consent by the client after consultation regarding the relationship.
Before applying this rule it is necessary to decide whether the Segals were involved in a "directly adverse" representation.
In automobile accident cases suits by passengers against drivers are common. Parties in such suits are "directly adverse" to each other; consequently, each must be represented by independent counsel. When it is clear, however, that the driver was not responsible for the accident, our rules permit the passenger and driver to be represented by a single attorney who complies with certain disclosure and consent conditions. *480 Those conditions, when met, eliminate the adversity of the clients. Adversity must be presumed, absent disclosure and consent.
Our Rules of Professional Conduct and opinions of the New Jersey Supreme Court Advisory Committee on Professional Ethics provide the guidelines for driver-passenger representation. Opinion No. 373 addressed the question of an attorney's representation of the husband-driver and wife-passenger in an automobile accident case. Liability resided substantially with a third person. The wife-passenger was not willing to assert a claim against her husband. The Committee said:
Under all the circumstances it should not be necessary for the wife to have a separate attorney. Opinions 156, 188, 248, and 253 permit exceptions to the general proscription of multiple employment exactly to the extent allowed under DR 5-105(c) [RPC 1.7]. The parties in the given situation are adults, capable of making an intelligent and informed judgment on the basis of the "full disclosure of the facts and of the possible effect of such representation." [citation omitted]
Opinion No. 248 of the same Committee involved an attorney's representation of a driver-mother and her child passenger. The Committee, after warning against such representation unless liability is obvious, said:
There appears no logical reason why one attorney cannot institute a single suit to recover on behalf of the driver and the passenger or on behalf of both passengers. However, if it appears that there is insufficient or inadequate insurance coverage by the negligent driver to permit full payment to both plaintiffs, an attorney should reconsider his representation of both. Otherwise, he may be compromising the interest of one of the plaintiffs to the advantage of the other, while endeavoring to settle both claims at one time.
RPC 1.7(a)(2) prohibits the representation of clients having adverse interests unless "each client consents after a full disclosure of the circumstances and consultation with the client...."
This requirement echoes the advice contained in Committee Opinion No. 373, namely, "Full disclosure" permitting an informed judgment. "Full disclosure" obviously requires prediction, a warning of future perils as well as present problems. It is an ideal, rarely achievable, but nevertheless a condition *481 which an attorney must satisfy at her risk. As Justice Pashman, concurring, said in In re Lanza, 65 N.J. 347 (1974), (dealing with an attorney's representation of adverse interests in a real estate transaction):
It is my contention that neither buyer nor seller can ever possibly fully appreciate all the complexities involved. That is precisely the reason why full disclosure and informed consent are illusory. [at 357]
Full disclosure is particularly difficult, and probably impossible, when the representation, as here, is undertaken before an investigation of the facts occurs. In the present case, full disclosure required at least an explanation of the marital relationship and its consequences, the possible liability of the Ernest Crain estate to the Mary Ella Crain estate and the reasons that it was considered inadvisable, as a matter of strategy, not to sue the Ernest Crain estate. The fact that third parties were likely to sue the Ernest Crain estate and that their suits were likely to be consolidated should have been discussed. This risk is underlined by the circumstance that one such suit was commenced only 19 days after Ann Segal filed her complaint. The real parties in interest in the negligence action were the minor children of the Crains; they were the ultimate beneficiaries of any damages recovered. Particular attention to the requirements of full disclosure and informed consent was therefore demanded.
The members of the Crain family had known both Segals for some time and had been represented by them in the past. They were aware of their marital relationship. Ann Segal's client, not Ann Segal, controlled the decision as to whether to sue Robert Segal's client. Ann Segal properly disclosed the existence of the claim and discussed the pros and cons of its pursuit. Her proofs should have been more exacting, less conclusory in this respect; it is not clear that her client's consent was truly "informed." Furthermore, neither Ann nor Robert Segal explained the consequences of the marital relationship, e.g., how it would affect a suit by the passenger's estate against the driver's estate and how the confidences of the clients would be *482 protected. Robert Segal failed to appreciate the prospect of an adverse claim and did not discuss it with his client. Strictly speaking, full disclosure was not made by the Segals.
Our courts, however, have not seen "full disclosure" as an illusory concept; they have permitted attorneys to represent adverse interests so long, apparently, as a reasonable effort was made to anticipate and expose problems to both clients before obtaining their consent. Thus, in Lanza, the Supreme Court would have approved an attorney's representation of both buyer and seller if he "... first explained ... all the facts and indicated in specific detail all the areas of potential conflict that foreseeably might arise." 65 N.J. at 351. Thus, foreseeability, which changes with the capacities of counsel and requires her knowledge of facts, acceptably limits "full disclosure." In In re Dolan, 76 N.J. 1 (1978), the Supreme Court, citing Justice Pashman, rejected arguments "in favor of a complete bar to any dual representation of buyer and seller in a real estate transaction". Id. at 12. It approved of "knowing, intelligent and voluntary" consents given after a client has had adequate time for reflection. Id. at 13.
Furthermore, no thorough analysis of our passenger-driver and husband-wife representation rules has been made in connection with full disclosure requirements. It is therefore unfair, in this case of first impression, to be overly exacting when considering whether full disclosure was made. This is particularly true when hindsight, permissible here since the suits themselves have been settled appropriately, shows no harm occurring as a result of any conflict of interest. For these reasons, it is my conclusion that the Segals complied sufficiently with "full disclosure" requirements to obtain informed consents. The direct adversity to which RPC 1.8(i) refers was therefore removed, making the Segals' representation permissible.
A trial court, however, cannot be content with the resolution of one alternative issue even when it is seemingly dispositive. *483 That is especially so when, as here, the resolution requires the court to walk a thin line. All issues should be resolved so that an appellate court, reviewing the decision and disagreeing with one resolution, can address the alternatives without the necessity of a remand. The question of the Segal's compliance with RPC 1.8(i), assuming the continuance of adversity, is therefore considered.

C. The Application of RPC 1.8(i).

Here, if the representation of the Segals was "directly adverse," contrary to my conclusion, it becomes necessary to decide whether the other conditions of RPC 1.8(i) were satisfied. That rule, repeated here for convenience, provides:
A lawyer related to another lawyer as parent, child, sibling or spouse shall not represent a client in a representation directly adverse to a person who the lawyer knows is represented by the other lawyer except upon consent by the client after consultation regarding the relationship.
This rule permits a wife and husband to represent consenting adverse interests; it contains no reference to "full disclosure." All the rule requires is "consent by the client after consultation regarding the relationship". "Consultation" is not defined. RPC 1.7(a)(2), by way of contrast, requires "full disclosure of the circumstances and consultation with the client," thus, perhaps, treating consultation as something different than full disclosure. Nevertheless, "consultation," even when limited by a literal reading of RPC 1.8(i) to a discussion of the marital relationship, certainly requires a broad spectrum of advice if it is to be meaningful. The Model Rules of Professional Conduct of the American Bar Association (1983) define "consultation" as "communication of information reasonably sufficient to permit the client to appreciate the significance of the matter in question." Furthermore, under usual rules of law, the "consent" required by RPC 1-8(i) must be informed consent to be effective. Dolan, 76 N.J. at 13. Any adverse interests of both attorneys, present and prospective, as well as the significance of those interests, must be explained to the *484 clients. On analysis, this court finds no difference between the requirements of full disclosure followed by consent and the requirements of consultation followed by consent. RPC 1.4(b) adds weight to that conclusion. It provides:
A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.
Here, the matter of "consultation" is complicated by the existence of real parties in interest who are minors. It was not possible to consult with them except through their guardian and none had been appointed when the Segals' representation commenced. No careful investigation of the facts of the accident had been undertaken. Nevertheless, the same reasoning that supported the conclusion that "full disclosure" had been made supports the conclusion that a sufficient "consultation" had occurred to permit informed consent to the husband-wife arrangement.

D. The Consequences of a Later-arising Conflict.

In this case it became necessary, eventually, for the Mary Ella Crain estate to sue the Ernest Crain estate. However, Robert Segal had no conflict of interest at that time because Ann Segal was no longer involved. Furthermore, since adequate "consultation" occurred as required by RPC 1.8(i), no conflict arose when the original representations were undertaken.
The problem of a later-arising conflict is a problem for Ann Segal, not Robert. Her relationship was terminated early in the proceedings when unexpected differences arose between her and Charlene DeBolt. Until then, she had performed services normally entitling her to compensation. Does the conflict deny the right to fees?
When an attorney represents potentially and foreseeably adverse interests, such as the driver and passenger here, and the adversity becomes actual, counsel must withdraw from any representation of both parties and all fees may be forfeited. *485 The question of forfeiture has not been decided in any reported decision and is not decided here. It is noted, however, that this may be the risk attorneys accept when undertaking the joint representation of potentially adverse clients. It is a consequence which would secure the enforcement of conflict rules. It is one risk to which the court pointed in Goodwin Motor Corp. v. Mercedes Benz of N.A. Inc., 172 N.J. Super. 263, 273 (App.Div. 1980), when it said that an attorney who believes he can adequately represent adverse parties "does so at his own peril." A forfeiture rule would recognize the difficulty a client may experience when obliged to change counsel in the middle of litigation. A new attorney, who has not had the opportunity to handle the initial phases of a law suit and who does not relish the prospect of a fee sharing controversy, may be hard to find. Finally, absent forfeiture, there is no risk in the decision to represent potentially adverse interests.
Here, however, any potential conflict which Ann Segal was obliged to consider and disclose at the beginning of her representation and any "consultation" required by RPC 1.8(i) had nothing to do with the totally unexpected differences that she encountered with Charlene DeBolt. Those differences were not foreseeable. Consequently, the peril rule of Goodwin Motor Corp. does not apply. Ann Segal is entitled to fees for her services. This conclusion is supported by Opinion No. 304 of the Advisory Committee. It held that a law firm, which properly represented multiple parties at the beginning of litigation and later withdrew completely because conflicts arose, was entitled to reasonable fees for services rendered. The opinion concluded that "all actions were continued and initiated in all good faith by the firm." No question of Ann Segal's good faith is raised. RPC 1.16(a) indirectly supports the right of a discharged attorney to be compensated for services rendered. It requires an attorney to withdraw if continued representation "will result in the violation of the Rules of Professional Conduct or other law" and when "the lawyer is discharged." Paragraph (d) requires a withdrawing attorney to refund "any *486 advance payment of fee that has not been earned." See also, Niebuhr v. Sassadeck, 15 N.J. Misc. 285 (D.Ct. 1937) aff'd 120 N.J.L. 183 (E. & A. 1938); Buckalew v. Grossbard, 189 N.J. Super. 584 (Law Div. 1983); In re Poli's Estate, 134 N.J. Super. 222 (Mercer Cty. Ct. 1975). See, however, Dewey v. R.J. Reynolds Tobacco Co., 109 N.J. 201 (1988), in which a law firm involved in a later arising preventable conflict of interest was denied all future fees.

CONCLUSION
Robert I. Segal is entitled to a contingent fee for his representation of the Ernest Crain estate in accordance with R. 1:21-7. Ann Segal is entitled to a reasonable fee for the services rendered by her to the estate of Mary Ella Crain. Her fees shall be deducted from those otherwise payable to Mark Kancher. In the event she and Kancher cannot agree as to the amount due her, the controversy shall be submitted to this court for resolution.